Good morning everyone. We'll start with the first case on our list, Dewey v. Volkswagen. May it please the Court, Theodore H. Frank on behalf of all of the appellants. Mr. Frank, good morning. I would like to reserve eight minutes for rebuttal. As this Court said in G.M. Pickup 55 F. 3rd at 808, one sign that a settlement may not be fair is that some segments of the class are treated differently from others. And you cannot get being treated any more differently than class members in the same class, with the same claim, with the same type of damage, where one subgroup gets 100 percent compensation and the other subgroup gets zero percent compensation. Let me try to cut to the chase here. Your position is that there's an Amchem problem here, is it not? It's both an Amchem problem and a 23E problem. All right. I'm sorry, I missed the last one. And a 23E problem. With respect to the alleged Amchem problem, which is that we've got a single certified class, but that that class includes both present and future claimants, isn't that really, isn't it the case here that all of the class members have indeed already suffered the same injury? That is, the failure to be informed of the manufacturing defect. Well, that's one of the injuries that the class has suffered. Many class members, including my client, Mr. West, have suffered the damage of actual leakage that they're not getting compensated for. And there are two different Amchem problems here. It's a difference, it's a distinction, but I'm curious as to whether or not it's really a relevant distinction that exists. Well, I want to distinguish between, there's the Amchem problem with past claims and future claims, and there's the Amchem problem with subclasses one through six getting compensation, reimbursement, and subclass seven not getting reimbursement for the same claim. Is that in fact true about subclass seven? I mean, isn't the question really whether or not the fund is sufficient in the long run to take care of the category seven? And the answer to that is no. You're a step ahead of me, and I understand that would be your position, and I would at least concede to you at this point from my understanding that that's at least a possibility. But it's not possible at this point, is it, to say that the funding will not take care of all claimants. The problem is, is that subclass seven never got notice that they had access to that fund. Well, isn't another, clear this up for me if you would. Are any of the class representatives, the named plaintiffs, members of subcategory or category seven? They are not. All right. So, isn't it a huge problem here that the category seven claimants have no representation, and in that lies the heart of the adequacy problem, and it's an adequacy problem that's close to the income situation. That's exactly right, Your Honor. That's our point. I mean, there's no one there in category seven among the representative plaintiffs to represent the interests of those claimants in category seven, to even argue whether or not $8 million is enough to take care of the present claimants and the future claimants. Is that fair to say? That's two different issues, but it's correct that there's nobody. How is it two different issues? There's a problem that there's nobody representing the future claimants. There's a problem that nobody's representing subcategory seven, which includes past claimants. Let me ask you this, if I could, Mr. Frank, on this same line. On page 27 of the brief filed by Volkswagen, it says here they insist, meaning you folks, that the settlement was suspect because there were no class representatives with future claims. That is not true. Here, several of the class representatives currently own class vehicles and could have potential future claims. So I take it their assertion is, you know, just because we had past claims doesn't mean we don't have future claims. We might have lots of people who have future claims, so we're really like the folks that the objectors are saying are unrepresented. What's your response to that? Our response is that people who have past and future claims are different than people who just have future claims. Because? Because the people with the past claims are more concerned about getting compensated for their past injury, where they know that they have $500 of damage, than of what the defendants characterize as a 0.5% chance that they will have future injury. So the assertion is that under AMCM, the fact that you might have some latent problem doesn't shift your allegiance because it's your past problem, your present problem, that swamps that and makes you think about getting money now. Is that it? I think that's correct, but I think it's secondary to the subclass 7 problem, where you have a full subclass that's getting no past or future compensation or no notice of any past or future compensation. How did we get to that past? I know it's Dr. Eades, if I'm saying the gentleman's name correctly, his construct that set that up, but explain to us why you think the district court accepted the rationale that this was a proper subclass, or not a subclass in a technical sense, but it was appropriate to separate this out. Wasn't it the magistrate judge's view that it's rational to say as a group they have less problems, got to divide this up somehow, so frequency of problems is a rational way to do it? Well, frequency is not a rational way to do it. I think that's a complete non sequitur. Frequency does not go to the quality of the claim. It goes to the likelihood of the claim. Frequency and probability. Isn't that really what we're talking about? Correct. Well, Judge Jordan mentioned the expert, Mr. Eades, and I realize that Mr. Eades' testimony and his methodology figured significantly here, but isn't it true, and I suppose this qualifies as something of a softball to you, I recall from reading Dr. Eades' testimony at the fairness hearing a week or so ago that he said, yes, we have this continuum of frequency or probability, but nobody relied on my opinion as to where you draw the line, where you fix a point on that continuum. The lawyers did that. That's correct. So whatever his methodology was, A, he didn't determine the rationality of where we decide a certain probability is sufficient to place people out here in Category 7, and I wish everybody would call them categories because it was very, very confusing to begin reading these briefs and see the frequent references to subclasses which don't exist and why everybody else has some entitlement to present claimants. That was not part of his methodology. That was not part of his opinion. It was a completely arbitrary distinction because, as you see in the Appendix 1188 and 1189, you have some cars with a much higher above-average frequency in Category 7 and some cars with much lower frequencies or probabilities in the first six categories. And I want to distinguish this case from insurance brokerage. I was going to ask you if insurance brokerage is a problem for you. I don't think so. I think that actually helps. Does it create a problem for you if we are looking at this as an Amchem or Ortiz sort of problem? It would create a problem for us if what they did was 7 million goes to the first six subcategories and 1 million goes to the category 7. And then we would be in a situation where we would be haggling over whether that was a good distribution. And insurance brokerage would say you can't do that. But it wasn't 7 and 1. It was 8 and 0. May I ask one more question, Judge Fuentes, because I know Mr. Frank has reserved a considerable amount of time for rebuttal, but just one more at this point. Would the adequacy issues that you maintain exist have been addressed, ameliorated, or eliminated had there in fact been technically subclassing? I think so. Thank you. Let me ask you one question. Is it your position that the maintenance information that is given to category 7 individuals has no value at all? Our position is that they have failed to prove that it has value, that their only evidence of value was a defective expert testimony report. Isn't it essentially putting those individuals in category 7 in the same position as if they had just bought their car? In other words, it's giving the same information they should have gotten when they received the vehicles or purchased the vehicles. Well, the problem is that the valuation of that, the expert valued it as the same value as if Volkswagen personally sent a mechanic to every class member's home and did the fix. Judge Fuentes may kick me under the table for this, but having raised that question of valuation, I do have a follow-up I'd like to ask. You carefully said in response to Judge Fuentes' question, are you maintaining that the information had no value, that they had not proven a value? The information has to have some value, doesn't it? Well, it could have negative value. How? If, for example, the information is go to your 40,000-mile dealer and get additional maintenance on this and we're going to do this additional maintenance and they raise the price of the 40,000-mile maintenance $10 and there is no evidence in the record one way or the other what Volkswagen dealers, who are not in this case, who are independent of Volkswagen, are going to do if their mechanics have to spend more time on 40,000-mile maintenance. I'm going to be interested to hear from the parties their position of valuation, but it seems to me that the information has to have some economic value, at least to people who do not, members of the class who do not already possess the information and anyone else, but that there's some time factor to that information. The information has to have some value initially, but doesn't that value dissipate over time? Isn't it lessened over time as the information becomes more broadly disseminated? And a good expert report would have accounted for that too, but the main problem is that it didn't account for the cost, which could very easily swamp the benefits. Thank you, Mr. Frank. Mr. Chase. May it please the Court. My name is Jeffrey Chase. I represent the defendants, VW and Audi. I'd like to reserve two minutes for rebuttal. Mr. Frank indicated in response to the Court's questions that the information provided, the revised maintenance information, had no value. This position totally ignores the gravamen of this claim. The plaintiff's focus in this claim was the absence of information to consumers. We have a class in excess of 5 million. Ninety-nine percent of the class members never had a water incident. So the main focus of the settlement, which we hammered out with the plaintiff's attorneys over a number of months, was to really meet the gravamen of their claim. Assume for the sake of discussion that that's the case, Mr. Chase. How does that answer the point raised by Mr. Frank on behalf of the West Objectors, that there was nobody at the table to negotiate for that 99 percent? If it's true that 99 percent of them belong in this group that gets nothing but a brochure, the value of which I guess we'll be discussing a little bit here, shouldn't somebody who actually was tightly aligned with that 99 percent have been sitting at that table when you were hammering out that settlement? Well, they were represented. The class members themselves all had a very strong interest in the future. They had vehicles, and they were part of the group. How does that answer the Amchem point, though? Speak to what Mr. Frank has said, which is, if you have the past or current injury, you want money now. And the fact that you might have an interest in something later is secondary. So you've got a conflict. You've got an inherent conflict because, as Amchem says, you want cash now. So even if you did want some later, that doesn't eliminate your want cash now motivation, which is the intra-class conflict they point to. How do you meet that? How do you address that? I believe this case is quite different than Amchem, where you had a major conflict between people who were suffering from all types of asbestos diseases, and you were dealing with people in the future, some who have not yet been identified. In this case, we knew all of our class members. They were before the court. But that doesn't answer Judge Jordan's question of alignment. Alignment is critical for adequacy purposes, as we all know. Is Mr. Frank correct that none of the representative plaintiffs were those in subcategory 7 who claimed only future damage? It is correct that they were not only a maintenance member. So how is that suggestive of alignment if, in fact, the differences are as characterized both by Mr. Frank and by Judge Jordan's question? As far as their interest, their main interest was going forward. And in addition, there would be funds left from the $8 million fund. In fact, there were $3 million left. That's what I'm trying to get you to. I'm wondering what your arc of reasoning is, Mr. Chase. You're asserting that their interest is in the future. That's not intuitively obvious. In fact, the AmChem decision reasoning, I recognize that you don't think this case is on all fours, but the AmChem reasoning is pretty emphatic in saying people with past or present injuries are different than people whose injuries are latent. Now, if you've got a person who's got both past and potential future injury, they straddle that, as you claim your people do, I'm wondering what is the reasoning you've got that undermines the AmChem statement that your current or past injury is going to be a powerful motivator and separate you from those who only have future injury? Other than asserting that it's different, do you have case authority? Do you have a logical argument for why it's different? I think it's a significant matter of degree, the differences between the two. You could not even identify class members in the AmChem. The injured people had a tremendous interest in getting as much money as possible into a pot, and no one was representing the future claimants. I think we have a difference here with class representatives having both reimbursement claims and the future claims. And in addition to that, besides their own position, the representation issue is twofold. It also includes counsel. And in this case, we had a very aggressive counsel on the other side representing their interests. So I see this twofold. Let's set the counsel issue aside. Let's stick with adequacy of the representative plaintiffs. Does the fact that the expert and then the district court and then the parties all start talking about this analytical construct as subclasses say anything about whether there really should have been subclasses here? Not at all. That unfortunate choice of language was used by the plaintiff's expert, and I agree it is confusing. Doesn't it communicate something real, which is that these are folks with different kinds of problems, so they should have somebody at the table representing their kind of problem? Well, as in any settlement, there are lines drawn. There are compromises made, and that was what was done here. The people in the information-only class had one. It was a three-to-one ratio. Help me understand one thing. What is it that characterizes those who fall into either Class B or Category 7, which is Mr. Frank's group? What is the chief characteristic? There were various reliefs offered here. There was a pure reimbursement on the $8 million fund. Well, I understand it has to do with all the other cars that were not mentioned in Groups 1 through 6 fall into 7. How is that distinction made? Yes. Primarily on the claims rate, but also design features were considered. But was I wrong about the idea that vehicles were set into certain subclasses or groups, and all the other vehicles that were not mentioned now fall into Category 7? Is that wrong? It's in part right, but part of it in the overall scheme of the settlement was looking to what was the claim rates, what was their experience in the field, and how could that be corrected? But I also understand that there are approximately 1 million people who would fall into that group. That's correct, approximately 1 million out of about 6 million. Now, you would consider that to be an insignificant number? No. No, it's a fairly large number, no question. But significant enough to warrant only the receipt of the maintenance schedule or maintenance information? Yes, because their experience in the field was so small. I mean, even the West objectors, 3 out of 4 of Mr. Frank's objectors did not have a water incident. The one person who did, Mr. West, was at 150,000, a 10-year-old vehicle. So this was a very rare event. Let me ask a very, hopefully, very practical question here, and it's hypothetical because we're not there yet. But let us assume, for purposes of the question, that this panel determined that there was an adequacy problem that exists and that as a consequence, the class as composed and as established based on frequency and probabilities and with these various categories could not stand as is. How much of a practical problem, which is also to say how costly would it be for the parties to regroup and fix this class allocation by subcategories? Mr. Frank has said in response to my question that yes, subclasses would fix the problem. How complicated would that be? A difficult question. First of all, I don't see it as a problem, but certainly it would take further work on this case. Let me ask you another question based upon the hypothetical predicate that we were to find a problem of adequacy and send the matter back to the district court. In doing that, what other issues, if any, other than the adequacy question and subclassing as an alternative, should this panel reach? Because there have been a host of issues raised by Mr. Frank as well as by the Sibley, another issue raised by the Sibley. If the case were to go back, I certainly think there would be a question on attorney fees, which we raised. And that was one of the questions posed by the panel. And I believe that there was an error in applying federal law. Well, understandably, the attorney's fees would change at least by quantity. But there's a question here of the application of New Jersey law as opposed to federal law. We've got valuations issues. There are numerous issues here that have been raised with us. And so my question, again, is largely practical. And that is, should we attempt to help and provide any guidance were we to send it back by reaching some of these other issues? Perhaps, counsel, your colleagues will want to respond to this as well. It's certainly our position that this was a reasonable exercise of the trial court's discretion, and the settlement should be affirmed. But if it were to go back, I believe that the evaluation done by the court was very reasonable. She looked at the expert submissions of all parties. I thought that she credited the submissions where they should have been. She took out unrealistic participation rates, such as 100%. She took care of double and sometimes triple counting. So as far as the evaluation, I thought that was reasonable. I understand the court's concern on this subgroup seven. Let me take you back, then, to the adequacy question, if I might, and ask you a similar question to that which I asked Mr. Frank. And that is, shouldn't we be troubled here by the fact that Mr. Eade's methodology was not what ultimately determined where the point on this continuum of frequency fell? That, in fact, his response was rather that the attorneys did that. That was up to them. Well, it's interesting. Although Dr. Eade did not make that determination, he was asked by the judge whether his analysis fit with the breakup of the various relief. And he testified that they did quite well, and it kind of made sense to him. That was not part of the scope of his work in this case, but he found it consistent. I've got to ask you about that, in fact. Mr. Chase, you had asked for two minutes rebuttal, if I'm not mistaken. That's correct. Under our rules, parties with cross appeals do not have the right to rebuttal. So what we'll do is just add two more minutes. Okay, very good. On this they did pretty well bit, excuse me, argument, I've got a question here. The average claim frequency, and I've got to get specific for a second, and I apologize. That's okay. There's so much stuff going on in these papers. But the average claim frequency for a Jetta sedan A5, which was not in subclass 7, or excuse me, category 7, here I'm falling into it myself, was not in category 7, is 4.165. But the claim frequency for the Audi A6 D2, not including model year 2001, was 4.42. And the Passat wagon B6, which was in category 7, had a frequency of 7.93. And we could go back and forth like this, but I realize that on the margins, where you draw the line may be hard, but what are we to make of a line that's drawn in a way where you have people with greater frequency of problems in the money, excuse me, not in the money than people who are in the money? I mean, that starts to feel irrational. What are we supposed to do with that? I think part of the problem is Objectors' Counsel came into this rather late.  So I think it was about 1,500 pages on the fairness issue, which discussed the whole history of the case. We had anomalies. That's part of a settlement. There were vehicles such as the Audi A8, which Mr. Frank pointed to, where it had very high claim rates. But part of that was this was understood by counsel. There was a manufacturing problem before that car was released, and that was actually noted in the submission to the court. There were other anomalies. At what point do we say you've got anomalies, but the fact that you've got people on both sides of this in-the-money, out-of-the-money dividing line and you can't say it's based on frequency because it's not based on frequency with these folks. I mean, at what point do we say, well, that's a dividing line that can't work? In this case, we believe it did work, and the trial judge who reviewed this in detail and was familiar with the history of the case felt it was reasonable. Part of it was we worked on frequencies. We also worked on design issues, and we also worked on the unique variables that vehicles may have been subjected to even on the assembly line. Any case law support for the idea that the frequency of a particular problem justifies the distinctions between class groups? As opposed to the extent of the damages? Yes, that is the type of factor that is used in the automobile industry. In fact, there were three service actions as part of this settlement, and what our clients would do is look at the field experience. That's very important. They would look at design issues, which is important. It's really a polycentric issue, and I think that this settlement was appropriately valued and it was appropriately distributed as far as relief, and that was done through hard work of counsel who had lived this case for three years. This was an extremely hard-fought litigation. This is not a settlement class. This case went through a lot of process. A lot of litigation, very hard-nosed, and I compliment my adversaries. They were fighting for the class. I think somewhat when we talk about did you have an appropriate representative, I don't think that's the whole picture. I think counsel in the real world of class actions, I think the counsel's role is very important, and we had a third factor in this case. We had an extremely hard-working magistrate judge who supervised this case, had us in her courtroom some days five or six hours, and that was part of it. Mr. Chase, your time has run out. Judge Jordan has one. Thank you. Thank you, Mr. Chase. Thank you very much. Mr. Slater. Thank you, Judge. May it please the Court. I have to say that I don't fully recognize the settlement I've heard discussed so far today, and I'd like to try to clarify what really went on and who's really in these groups, because I think that that gives us a chance, because I see where the tide is going, but I think it gives us a chance to make you look at this a little bit differently. Let me try to clear up a couple of the misunderstandings. Number one, let's talk about group seven first, because that's really, I think, what's at the core of your concerns. Group seven is not a group of people with future claims. Group seven is a segment of the people in the class that have had water damage occur to their cars and who have not had water damage occur to their cars, the same as all of the other six groups that Dr. Eades created as a convention for his analysis. Isn't the whole idea behind the preventive maintenance information that if you do this, you will avoid having a problem which would otherwise be likely to occur? Isn't that the – that's your argument for why the preventive maintenance information has any value at all, right? Because if you don't do this, you'll have problems, and we've saved you money. If that's not a statement of a future claim, what is it, Mr. Slater? Well, my point is this, and I have two responses to that. There are people in group seven and all of the groups who have had water damage occur to their cars and who have not. So I'm not taking issue with the term future claimant. That's as good a term as any for people who have not yet suffered water damage. But what we have in this case is something you don't have in Amchem, you don't have in Ortiz, you don't have any of the other cases that I've seen and that the Court has focused on in its letter, which is the ability to prevent the future harm from a point in time. You don't have that, obviously, in Amchem and Ortiz, where you have people who have been exposed to asbestos, and you don't know what's going to happen. You don't have that on the table as an option. This case stands, frankly, unique compared to those other cases because it has this aspect, that you can give significant value, whatever the valuation is, that's a different discussion. I understand that, and I appreciate that comment, that I think that really the concern of the objectors is the valuation, not the question of value. You didn't have that option in those cases. So you have to look at this case, I think, differently than you look at Amchem and Ortiz. Why? I understand that the distinction you're drawing, which is you may be able to prevent the harm with an automobile with a preventive maintenance, whereas exposure to asbestos is going to do what it's going to do. But how does that undermine the basic principle, which Amchem seems to be teaching pretty emphatically, and that is if you have people with a latent problem that may or may not develop, their interests are different and distinct from people who have a current or past problem, and so they deserve something different. I understand your suggestion that, well, maybe they'll never have the problem if we can help them, but there's still a class of people who haven't had a problem yet and whose interest is therefore distinct and different from people who have had a problem, aren't they? There's no question that what you're saying is absolutely valid. Let me tell you what I think we did in this case and where I think a lot of the misunderstanding exists here. You have this option that we took advantage of to prevent harm in the future, whereas exposure already occurred with the asbestos. We don't know who's going to get hurt. Now, I want to tell you what I think the real disagreement is, or what I think the interclass conflict that they see on the objector side, which we believe is not fatal to the settlement. It's among the people who suffered harm. That's the real issue in this case. The issue is not between people who may suffer water ingress in the future, because that is every single person in the class has that same problem, and we took care of it with the preventive maintenance information that prevents the harm. The issue is, how did we split up or allocate the available relief based on our negotiation where the defense said, this is as far as we're going to go. How did we come to an agreement that this is how we're going to say, you're going to have a chance to get money now, and it's not 100 cents on the dollar, by the way. Only the people in the service actions were getting 100 cents on the dollar. The people do have people in Category 7 that have had actual damages. And that's what I'm saying. If there's a problem to focus on, that's the problem, is that there were people who were given the right through the service actions. The P9 and the JU, they got reimbursement right through that. Then there's the reimbursement fund, and people were given the right in the third service action plus the other three groups of cars to go to that reimbursement fund for water damage to their carpets or to their transmission control module. And then Group 7, they're allowed, if there's a residual, to the reimbursement fund to make the goodwill claims. So the question is, how did we decide who has the right to go for money now and who has to wait to see if there's money later? And I say that is an insurance brokerage situation informed by the type of discovery that did not occur in community bank. Insurance brokerage, however, did not talk about an Amchem or Ortiz problem, did it? I mean, I don't think those cases were even mentioned. I don't think so. I don't think so. And I don't really think we have an Amchem or Ortiz issue. Well, I understand. But if we think that there is one for purposes of resolving that, we can hardly rely upon insurance brokerage. There's no question. I mean, this is a judgment call for this Court. But if you look at things the way I'm framing them, everybody is a so-called future claimant, and they got the same relief for the future. I'm sorry. No, go ahead. The question is, how did we split up the money, allocate the money and the relief among people who have suffered damage? And that's why I say as to those people, those people who suffered damage, and, frankly, Mr. Frank has an issue, which I'm jumping ahead. But how did we split the money up among them? And I think that's an insurance brokerage allocation issue, and what the judge had to do was act in an equitable way and come to a decision that what we did was reasonable based on the fact that this was a very uncertain litigation. Community bank seems to say it's not like community bank. But community bank, we said specifically, look, if you had dealt with subclasses here, you could have resolved this problem. So I ask you what I asked Mr. Chase. Isn't the fact that everybody started talking in terms of subclasses here kind of an indication that there should have been subclasses here? And how hard would it have been? That's a great question. That's the question I was about to go to. So great minds think faster than I do. I think you could always say in the abstract, oh, sure, it would be great to have subclasses because that will fix all the problems, because everyone will be at the table. But here's the question. This Court has talked about it so many times. Are you going to balkanize things? Where do you stop? And I think it's a legitimate concern here. And I want to say, Judge, it's not a theoretical problem here. It's actually a very, very practical problem in this case. Look at Mr. Frank's clients. Look at what he represents. He has somebody who actually suffered damage at 150,000 miles, albeit who's going to want money for his damage. Then he represents three people who didn't suffer damage. So now they're going to say, well, I'm more concerned about the future. Now, do we have to have a subclass? And I'll answer your question also. Do we want, if we go back, do we want direction? I say as a plaintiff lawyer and a trial lawyer, please give us all of the direction you can on the trial level when an appellate court leaves something ambiguous. It's always a problem for us because we don't know if we're coming back. We'd like to know exactly what we'd have to do to fix a problem down to the T, obviously, to be practical. I'm sorry. Mr. Frank also says that even what Category 7 receives, which is the maintenance information, comes at a cost. Well, I think that's – I say so does changing your oil, so does changing your wiper blades and all the information you get with a vehicle. And to say that it's valueless, I think, is illogical. But with one million vehicles in Category 7, that's a pretty substantial cost. Well, it's not because if you look at the terminology of what people were told, they were told something that was interesting to learn, and we learn things as lawyers, just cleaning out the debris out of your plenum. You pop the hood once in a while, take out the leaves, clean around the sunroof. That is an important thing to do with these drains. And also, at a 40,000 maintenance, they'll flush it out. Or you could do that yourself. So it's not a significant cost. And what we learned is how they're – I'm sorry. Does that sort of hit the question of this doesn't have value? I mean, Dr. Eades, when questioned about it, isn't this just common sense you're telling people? He said, yeah, it's common sense. Some people don't have common sense. But does expressing to the world common sense mean that you have conferred a valuable benefit on a class? He didn't say common sense. What he said was – he didn't even know it, actually. And what he said was it's easy to do. And when I asked him about value, there's – well, he obviously valued it, and the court accepted there's value because if you do this, you're going to prevent water from getting into the car and causing significant damage. And, in fact, I will say preventing the harm is far more valuable than having the harm occur and getting the money to fix it later. Maybe I didn't answer your question. I'm sorry. And maybe there's not a good answer to it from your perspective. But you likened this to an oil change. You know, in a sense, it is like that. If you have to say to somebody, if you've got rocks and twigs down in there or leaves, it's a good idea to take them out. Have you really said something that is a benefit to the class, or have you merely stated the obvious and then claimed it's a benefit to the class? Well, that's one of the things we did in this litigation, is we fought and had to take many depositions to get the field people for this company to admit to us what was going on. It was – in hindsight, it sounds obvious, but they weren't telling anybody, and nobody was doing it. And what we learned was the reason they weren't doing it was because this was how they kept their warranty claims down, and this is how they denied warranty claims as quote, unquote, outside influence. They knew, and I had deposition testimony in this record. We learned that you had the field people saying, well, you've got to talk to the warranty people because they made a money decision. If they gave this maintenance instruction, then it's no longer quote, unquote, outside influence, and when someone comes in with water damage, now we have to cover it under the warranty. And what we did is we changed that, and this was not an easy fight, and we had to get the top people in the warranty department, and we cited it in our brief where they said, you know, this isn't fair, and this wasn't right, and we shouldn't be turning these claims down. So maybe it sounds obvious now, but that's what a lot of the great inventions in the world are. They sound obvious after someone turns on the light bulb. It wasn't obvious they weren't doing it. So I hope that answers your question. And it is significant value because, again, you don't want this to happen, and we put a number on it that we think is very defensible. And there may be some issues around the corners, but this is a common fund case, so the evaluation doesn't have to be exact to the penny anyway. I'm sorry. I did have one additional question, which is you've talked about these goodwill claims that might be made in the future, but isn't it the case that pretty much everybody has acknowledged there's not going to be money in that pot? Oh, no, there's $3 million. We know it right now. There's $3 million. There is right now. There is $3 million. If you – I'm sorry to interrupt, but to get to I think what you're saying, all the claims have been processed. We know how much money is left. $5 million. You do know. We know the number. It's about $3 million, and we have an interest-bearing account, so it's been accumulating interest. So there is $3 million there, which, you know, based on the claims rates we've seen so far and knowing that Group 7 had the lowest rates generally, I mean, there's some anomalies. Why was there expert and court misunderstanding in thinking this was going to be underfunded, do you think? This is what it was. Dr. Reeds did a valuation, and frankly, that was my decision to value at 100% because we felt that was the right way to go, and we looked at Boeing, and reasonable minds could differ, I suppose. But we told him to do 100% valuation, so he projected based on what number of people were out there, the claims rates, what the full amount of every person with a potential claim out there for all the damage came in and made a claim, and it came in at, I think, I don't remember the exact, $13 million or something like that. But in practice, the claims equaled about $5 million. I could get you the specific number. There's a pot of money still. There's $3 million there that if we've persuaded you, that money is going to be available. And it's very clear that the cars in Category 7 and the owners would have access to that fund. Absolutely. They would go make goodwill claims, and Volkswagen would be highly motivated to spread that money among all. But that fund is not going to stay in place forever, right? Five years. Five years. And how will disbursements be made from that residuary fund? If somebody makes a claim through Volkswagen, through their goodwill program, which is sort of the corollary to the warranty program, you know, you're out of warranty, but the Volkswagen dealers will give the money, and then reimbursement to Volkswagen will come from the reimbursement fund, so that's my understanding is it will funnel it through Volkswagen, and as one of the attorneys on the case, I think that's what's going to happen. Mr. Slater, thank you very much. I was going to try for a little more time, but I'm not going to be greedy. Thank you very much. Appreciate the opportunity. Thank you. Mr. Frank? Thank you, Your Honor. I'm sorry, Mr. Frank, I missed somebody. Mr. Sporn. Oh, I have a reply, actually, two minutes, but in view of the discussion, I'm yielding to Mr. Slater. You have two minutes, Mr. Slater. Back on stage. I don't know if that's a gift. It's funny, you lose your momentum and you don't know what more to say. You don't have to say anything. Can I just say, please, for two minutes? Yes. I just hope that in this few minutes that I've had to speak that I've cleared up the misunderstanding about what we really did in structuring this deal, and I would answer, unless you have a question, obviously, that's a better. I just was going to say all the people in this room can feel comfortable that we have given this a lot of attention and are well, you know, Mr. Chase was saying, hey, the magistrate judge worked really hard. This was hard. Nobody's disputing that this was carefully and thoroughly and diligently considered by the court and that the lawyers in the case were working to try to do something that they thought was valuable. I think you've noted from the questions, we've got a concern, and we appreciate people helping us with it about 23A4 and about some other issues. And so, yeah, when you say, please, I hope you're paying attention. Oh, no, I didn't say it that way. I wasn't saying that. Definitely paying attention. I was saying I hope that maybe I've clarified some things. I would speak to two things very briefly. One, Dr. Eades is not the person to lay out for us how we should do this settlement. I would take issue with that. I think in a case like this, it's for the attorneys and the litigants, and remember, one of the litigants in this is the largest automobile manufacturer in the world. They have tremendous technical resources, tremendous access to data, which we plied through in extensive, very, very many months of confirmatory discovery to come up with this, and then we asked Dr. Eades to value this because we knew valuation was important. So that's my answer on that. The last thing I want to say is, again, ask Mr. Frank, how many representatives do we need to add to this settlement if we go back? Do we have to have a subclass representative for every single one of the models? When does it end? Because the big concern, and I don't think it's rhetoric, and it's not rhetoric in this case, is do we get to a big table and you have somebody with an outlying situation and says, well, you know what, better throw me some money or I'm not going to make this deal. You suspect that Mr. Frank is going to ask for divisions of Category 7? Category 7, you can't just have one class representative for them, most likely. I mean, his objectors, some of them come from the service action group. He has a golf client that got the service action and the right to get reimbursements. So you're suggesting that subcategory 7 itself lacks cohesion? What I'm saying is, what I'm saying is this. No, what I'm saying is if you take his argument to its logical extreme, because this Court has been very concerned about taking the subclass route so far that you make it impossible to settle a case because people who are being treated fairly in the whole say, well, you know what, I'm going to hold you up. And that's my only concern. It's a very good point. So your concern is about re-noticing after there's been another settlement and getting another group of objectors in? As a secondary concern, my concern is practically if we do go back, obviously, we want to make this the best settlement we can and not have to be back in front of you. And my concern is who's going to be at the table before we say, okay, we can sign the piece of paper. And I'd like to keep that to a controllable number of people and not people who can say, well, now I've got you. Hypothetically, if you do go back, do we need to reach the notice issue that's been raised here since the case would have to be re-noticed? I don't think so. And I think our notice was fine anyway. The whole settlement agreement complies with the rule. It's sitting on the website. And what about the fee issues, which really, in terms of bulk, preponderate here more than anything else? I think that, you know, you identified one issue. I won't go off and talk about everything else. Obviously, you read our brief very carefully. I think the idea that Rule 23H would not have applied to the attorney's fees here, it really makes no sense. And I'm not going to profess to understand ERI. I didn't understand it in law school. I probably still don't understand it now. But it does say very clearly, if an act of Congress covers the area, that's the first place you look. And the Rules Enabling Act put the Federal Rules of Civil Procedure in place for this purpose. You have Rule 23G that talks about attorney's fees. In the appointment of counsel, it actually addresses some attorney's fees issues. And then the defense would say, well, now you're going to jump to state law and skip 23H. You're going to slice through Rule 23. It really doesn't make any sense. I think what the judge did below was entirely consistent with diet drugs. The best example you can have of a federal case based on state product liability claims, and you do it through the federal cases in the Third Circuit, you decide how the fees are going to be awarded. That's our case. Very good, Mr. Slater. Thank you very much. Thank you very much. Mr. Frank. Thank you. I'll start by answering Mr. Slater's question. You don't have to have any subclasses. You could have one single class and everybody gets the same relief. And we have one class here. But you have Mr. West. Do you have other main plaintiffs that would satisfy all of the problems with regard to Category 7, all the vehicles, all the issues? The issue, the claim is we have to treat Category 7 different because they have a different frequency rate. First, that's a non-sequitur because the underlying certification of the class is everybody has issues in common, everybody has the same injury, so on and so forth. So we have in Sullivan, as a practical matter, can that be done when you say just put them all in the same pot together? If there was a pot of $8 million, 5 million of which is gone, 3 million of which is left, at this juncture is it even possible to do what you're suggesting? Well, again, a settlement is a compromise. It doesn't have to be the case that everybody gets 100 percent compensation. It just can't be the case that some people get 100 percent and some people with identical claims in the same class with the same representatives get zero. And, you know, they say how old Mr. West's car is, but you have people in Subgroup A or Categories 1 through 6 who have cars as old as 1997. You have people in Category 7 with cars as new as 2009. So is your suggestion, if this were to go back, is to say you should treat everybody alike with respect to the $3 million that's left in the pot? No, you should treat everybody alike with respect to the $8 million. And if 5 million of that is gone? Well, the 5 million hasn't been paid out. The 5 million of claims has been made. To my knowledge, they have not been paying claims at Volkswagen sitting on the money waiting for this court to rule. I do want to go to the goodwill issue because nobody until plaintiffs' appellee brief thought that Category 7 could collect money. The judge didn't think Category 7 could collect money. The settlement administrator didn't think Category 7 could collect money. My client made a claim. I had my client go ahead and make a claim to see what would happen. Settlement administrator says, you can't make a claim. You're in Category 7. Didn't say Category 7, but said you're not one of the eligible vehicles. The notice does not say that Category 7 class members can make a claim. That's at Appendix 403. And in general, we discussed this at page 15 of our fourth stage brief. The fact that there's this $3 million left over, though the judge found that there would not be money left over and made her ruling based on the assumption that there would be no money left over. You don't dispute, do you, the factual assertion that's being made to us that $5 million in claims have been made? Now, you're saying they haven't been paid out, but they've been made and that now we know that's what's been made and there is a residual fund. There is a residual fund, and if you take the defendant's argument, it's true that there are a million vehicles in Category 7 with a 0.3% frequency of injury rate and an average claim of $500, all of them could be paid from the residual if there was a remand with instructions to give notice to Category 7 that they can make those claims. Right now, nobody in Category 7 knows that they can do that. According to the plaintiffs, what you do is you go onto the website, you ignore what the notice says, you go onto the website, you ignore what the website says, you go and read the settlement agreement, and you make a contested argument about an ambiguous provision in the settlement that the goodwill applies to Category 7. And the judge, having done all that with all the care that she took, thought that Category 7 doesn't get to make any claims. It's interesting, though, because Mr. Slater was speaking as if you had a right to make a claim all along. Which just simply isn't true. And it's in the record that it's not true. And the judge found that it wasn't true. So I really don't understand why. Your problem then is not that there's no funds available, but that you would have to notify all those who might be eligible. That's correct. Nobody knows that they're eligible. And it's not even clear that they are eligible. If you affirm, there's nothing in the settlement saying that they're eligible other than counsel's representation in a brief and an oral argument, which aren't on the website either. There's no way anybody in that class knows to make a claim. If somebody gets a notice, maybe I should check this website four years later to see if they changed their mind. That doesn't work. So, you know, to the extent that the defendants are arguing it's okay to have Category 7 without relief because they have different design features and they're basically different vehicles, then you have a commonality problem. You don't have a single cohesive class anymore if what you have is several different vehicles. If Category 7 really has different claims that justifies excluding them from pecuniary relief, why not throw Toyotas into this class? Either these are all identically situated vehicles with the same claims and the same class representatives, or they have wildly different claims where one is entitled to 100% of relief and the other is entitled to 0% of relief. And they can't have it both ways. Simply put, Walmart versus Dukes doesn't permit that. So what you could do is you could have a Sullivan versus DB kind of settlement where you have different claims getting identical relief, but what you can't do is you can't have identical claims in identical class, identical representatives getting different relief. Happy to answer your questions. I have no questions. Mr. Frank, thank you very much. One more point I wanted to raise on the benefits versus costs of the informational relief. One of the retrospective reliefs, and the Court found this. This is facts that the Court found. It costs Volkswagen $55 million to provide $24 million of benefit to the class, and that's with one of the higher frequency vehicles. So it's not outside of the realm of possibility that the future relief costs more than the benefit it provides. It provides an average of $8 per class member, according to the wildly optimistic EADS projection, which assumes 100% ignorance, 100% people read the letter, 100% comply with the letter, and 100% effectiveness. And with all of those assumptions, he comes up with a value of $8 per class member in that subcategory 7. Once you start picking away at those unrealistic assumptions and offsetting it with the additional costs of the 40,000-mile maintenance, it's far from clear that this is a positive benefit and not a negative benefit. Thank you, Your Honor. Thank you, very substantial. Yes, thank you, Mr. Frank. And thanks to all counsel for excellent arguments. We'll take the case under advisement.